IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DONNA INGRAM, et al.,

            Plaintiffs,

      v.

THE VANGUARD GROUP, INC., et al.,

            Defendants.

CIVIL ACTION
NO. 14-3674

## OPINION

**Slomsky, J.**                                                    **July 17, 2015**

## I.    INTRODUCTION

Plaintiffs Donna Ingram, Jo DiGiovanni, and Wendy Kenworthy bring this lawsuit

against the Vanguard Group, Inc. ("Vanguard") and several individuals who supervised them

during their tenure at Vanguard.  They allege that during their employment at Vanguard they

were subjected to employment discrimination, retaliation, and a hostile work environment in

violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the Civil Rights

Act of 1964, 42 U.S.C. § 2000e, et seq., ("Title VII"), the Pennsylvania Human Relations Act, 43

Pa. Stat. § 951, et seq., (the "PHRA"), and the Age Discrimination in Employment Act, 29

U.S.C. § 621, et seq., (the "ADEA").

In the Amended Complaint (Doc. No. 24), Plaintiffs assert the following claims:

- Count I:  Plaintiff Ingram against Defendants Vanguard, Christopher Hammond,
  Martin Schamis, Tracy Richards, and Christopher Schmidt for race discrimination

based on disparate treatment,[1] a hostile work environment,[2] and disparate impact[3] in violation of Section 1981.

- Count II:  Plaintiff Ingram against Defendants Vanguard, Hammond, Schamis, Richards, and Schmidt for retaliation[4] in violation of Section 1981.

- Count III:  Plaintiff Ingram against Defendant Vanguard for race discrimination based on disparate treatment, a hostile work environment, and disparate impact in violation of Title VII.

- Count IV:  Plaintiffs Ingram and DiGiovanni against Defendant Vanguard for retaliation for their complaints of race discrimination in violation of Title VII.

- Count V:  All Plaintiffs against Defendant Vanguard for gender discrimination based on disparate treatment and a hostile work environment, as well as retaliation, in violation of Title VII.

- Count VI:  Plaintiff Ingram against Defendant Vanguard for race discrimination based on disparate treatment and a hostile work environment, as well as retaliation, in violation of the PHRA.

- Count VII:  Plaintiffs Ingram and DiGiovanni against Defendant Vanguard for retaliation for their complaints of race discrimination in violation of the PHRA.

---

[1] A disparate treatment claim is based on allegations that the employer "simply treats some people less favorably than others because of their race, color, religion [or other protected characteristics]." Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977). Proof of discriminatory motive is needed to support this type of claim. Id.

[2] A hostile work environment claim is based on allegations that "the workplace is permeated with discriminatory behavior that is sufficiently severe or pervasive to create a discriminatorily hostile or abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). "[T]he 'hostile work environment' theory is designed explicitly to address situations in which the plaintiff's claim is based on the cumulative effect of a thousand cuts, rather than on any particular action taken by defendant." O'Connor v. City of Newark, 440 F.3d 125, 128 (3d Cir. 2006).

[3] A disparate impact claim involves "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977).  "Proof of discriminatory motive . . . is not required under a disparate impact theory." Id.

[4] A retaliation claim is based on allegations that an employer has retaliated against an employee for either opposing unlawful discrimination or participating in an administrative or judicial proceeding regarding alleged unlawful discrimination. Moore v. City of Phila., 461 F.3d 331, 341 (3d Cir. 2006).

- Count VIII:  All Plaintiffs against Defendant Vanguard for gender discrimination based on disparate treatment and a hostile work environment, as well as retaliation, in violation of the PHRA.

- Count IX:  Plaintiff DiGiovanni against Defendant Vanguard for age discrimination[5] and retaliation in violation of the ADEA.

- Count X:  Plaintiff DiGiovanni against Defendant Vanguard for age discrimination[6] and retaliation in violation of the PHRA.

- Count XI:  All Plaintiffs against Defendants Hammond, Richards, Schamis, and Schmidt, and additional Defendants Brian Hamilton, Bob Smith, and Bob Arata for aiding and abetting liability under the PHRA.

(Doc. No. 24 ¶¶ 243-315.)

Defendants have filed a Motion to Dismiss Partially the Amended Complaint.  (Doc. No. 26.)  In the Motion, they seek to dismiss:  (1) Plaintiffs' claims asserted in paragraphs 48-58, 75, 134-53, and 192-208 of the Amended Complaint because they are time barred; (2) Plaintiffs' hostile work environment claims; and (3) Plaintiffs' disparate impact claims.[7]  Defendants'

---

[5]  In Count IX, DiGiovanni does not specify the theory, or theories, of discrimination on which she bases her claim.  Count IX simply reads, in relevant part, "By committing the foregoing acts of discrimination and retaliation against Plaintiff DiGiovanni, Defendant has violated the ADEA."  (Doc. No. 24 ¶ 301.)  Plaintiffs will be required to file a notice within twenty days of the date of this Opinion specifying the theory, or theories, of discrimination on which DiGiovanni bases her claim in Count IX.

[6]  In Count X, as in Count IX, DiGiovanni does not specify the theory, or theories, of discrimination on which she bases her claim.  Count X simply reads, in relevant part, "By committing the foregoing acts of discrimination and retaliation against Plaintiff DiGiovanni, Defendant has violated the PHRA."  (Doc. No. 24 ¶ 307.)  Plaintiffs will be required to file a notice within twenty days of the date of this Opinion specifying the theory, or theories, of discrimination on which DiGiovanni bases her claim in Count X.

[7]  In the Motion to Dismiss Partially the Amended Complaint, Defendants also sought to dismiss the following:  (1) Plaintiffs Ingram and DiGiovanni's claims against Defendant Arata for aiding and abetting liability under the PHRA (Count XI); (2) Plaintiffs Ingram and Kenworthy's claims against Defendant Hammond for aiding and abetting liability under the PHRA (Count XI); (3)  Plaintiffs DiGiovanni and Kenworthy's claims against Defendant Richards for aiding and abetting liability under the PHRA (Count XI); and (4) Plaintiff Ingram's disparate impact claim under Section 1981 (Count I).  (Doc. No. 26-2 at 18-23.)  In

Motion is now ripe for a decision.[8]  For reasons that follow, Defendants' Motion (Doc. No. 26) will be granted in part and denied in part.

## II.    BACKGROUND

### A.    The Parties

#### 1.    Plaintiff Donna Ingram

Plaintiff Donna Ingram is an African American woman.  (Doc. No. 24 ¶ 8.)  She began working at Vanguard in November 2000 and, at the time the Amended Complaint was filed, was on leave from her position as Team Leader in Vanguard's Retail Client Account Services Department.  (Id.)

---

Plaintiffs' Response in Opposition to the Motion, Plaintiffs indicated that they are withdrawing these claims.  (Doc. No. 28 at 4 n.1.)  Accordingly, these claims will be dismissed.

Defendants' Motion also states that they are seeking to dismiss all the claims against Defendant Hammond.  (Doc. No. 26-1 ¶ 5; Doc. No. 26-2 at 21, 29.)  However, Defendants' Memorandum in support of their Motion only addresses Plaintiffs' PHRA aiding and abetting claims against Hammond asserted in Count XI, and Plaintiff Ingram's Section 1981 disparate impact claim against Hammond asserted in Count I.  (See Doc. No. 26-2 at 18-22, 29.)  As noted above, Plaintiffs have agreed to dismiss both of these claims.  (See Doc. No. 28 at 4 n.1.)  Defendants' Motion does not address Plaintiff Ingram's Section 1981 disparate treatment, hostile work environment, and retaliation claims against Hammond asserted in Counts I and II.  Therefore, Plaintiff Ingram's remaining Section 1981 claims against Hammond will not be dismissed.

[8]  Plaintiffs filed their original Complaint on June 13, 2014.  (Doc. No. 1.)  On September 16, 2014, following a hearing on Defendants' Motion to Dismiss Partially the Complaint, the Court granted Plaintiffs leave to amend their Complaint.  On November 3, 2014, Plaintiffs filed the Amended Complaint.  (Doc. No. 24.)  On November 17, 2014, Defendants filed another Motion to Dismiss seeking to partially dismiss the Amended Complaint.  (Doc. No. 26.)  On December 19, 2014, Plaintiffs filed a Memorandum of Law in Opposition to Defendants' Motion.  (Doc. No. 28.)  On January 9, 2015, Defendants filed a Reply.  (Doc. No. 29.)

4

### 2.    Plaintiff Jo DiGiovanni

Plaintiff Jo DiGiovanni is a Caucasian woman.  (<u>Id.</u> ¶ 9.)  She began working at Vanguard in 2004 and, at the time the Amended Complaint was filed, was on leave from her position as Team Leader in Vanguard's Retail Client Account Services Department.  (<u>Id.</u>)

### 3.    Plaintiff Wendy Kenworthy

Plaintiff Wendy Kenworthy is also a Caucasian woman.  (<u>Id.</u> ¶ 10.)  She began working at Vanguard in November 1997 and was fired from her job at Vanguard as Team Leader on October 20, 2013.  (<u>Id.</u>)

### 4.    Defendant Vanguard Group, Inc.

Defendant Vanguard Group, Inc. ("Vanguard") is an investment management company. (<u>Id.</u> ¶ 11.)  It offers mutual funds and other financial products and services to individual and institutional investors in the United States and abroad.  (<u>Id.</u>)  It has an office in Malvern, Pennsylvania.  (<u>Id.</u>)

### 5.    Defendant Christopher Hammond

Defendant Christopher Hammond was a Manager in the Retail Processing Group at Vanguard.  (<u>Id.</u> ¶ 22.)  Hammond directly supervised Plaintiffs Ingram and Kenworthy.  (<u>Id.</u>)

### 6.    Defendant Martin Schamis

Defendant Martin Schamis was a Senior Manager in Retail Client Account Services and was the "skip-level" supervisor[9] of all three Plaintiffs.  (<u>Id.</u> ¶ 23.)

### 7.    Defendant Tracy Richards

Defendant Tracy Richards was a Manager in the Retail Processing Group at Vanguard. (<u>Id.</u> ¶ 24.)  Richards was the supervisor of all three Plaintiffs.  (<u>Id.</u>)

---

[9]  In the Amended Complaint, Plaintiffs use the term "skip-level supervisor" to refer to a person who supervised the direct supervisors of Plaintiffs.

### 8.   Defendant Bob Arata

Defendant Bob Arata was a Senior Manager in the Retail Processing Group at Vanguard. (Id. ¶ 25.)  Arata was also the "skip-level" supervisor of all three Plaintiffs.  (Id.)

### 9.   Defendant Christopher Schmidt

Defendant Christopher Schmidt was a Manager in Retail Client Account Services at Vanguard.  (Id. ¶ 26.)  Schmidt also supervised Plaintiffs Ingram and Kenworthy.  (Id.)

### 10.   Defendant Brian Hamilton

Defendant Brian Hamilton was a Manager in Retail Client Account Services at Vanguard. (Id. ¶ 27.)  Hamilton directly supervised Plaintiff DiGiovanni.  (Id.)

### 11.   Defendant Bob Smith

Defendant Bob Smith was a Manager in the Retail Processing Group and Retail Client Account Services at Vanguard.  (Id. ¶ 28.)  Smith directly supervised Plaintiff Kenworthy.  (Id.)

## B.   Plaintiffs' Allegations

In the Amended Complaint, Plaintiffs allege that Vanguard has "fostered a continuous pattern and practice of discrimination and retaliation against its employees who are not young, Caucasian males."  (Id. ¶ 12.)  Plaintiffs claim that Vanguard routinely "manages out" employees who are either female, African American, or older, by subjecting them, for example, to unmerited write-ups and performance critiques, giving them assignments for which they have no training or experience, and loading their teams with underperformers in an effort to set them up for termination.  (Id. ¶¶ 32(d), 37(c), 73-78; Doc. No. 28 at 4-6.)  Moreover, Plaintiffs describe a working environment at Vanguard that is hostile to employees who are either female, African American, or older.  (Doc. No. 24 ¶¶ 13-18, 21, 30, 33.)  Plaintiffs additionally allege that the complaint process in Vanguard's human resources department, known as "Crew Relations," is

not only ineffective, but facilitates retaliation against employees who file complaints.  (Id. ¶¶ 19, 32(a), 34-35.)  In addition to these general allegations, each Plaintiff sets forth claims in the Amended Complaint pertinent to their own employment at Vanguard.  These claims are as follows:

### 1.    Plaintiff Ingram's Individual Claims

Donna Ingram began her career at Vanguard in 2000 as a Service Associate in Personal Financial Planning at Vanguard's Malvern, Pennsylvania office.  (Id. ¶ 45.)  In 2008, she transferred to the Retail Processing Group as a Supervisor and began reporting to Jeff Fafara, who was the manager of that group.  (Id. ¶ 46.)  Almost immediately, Fafara instructed Ingram to "manage out" two older African American women, which Ingram refused to do in the absence of a meritorious reason to support such action.  (Id. ¶ 47.)  In 2010, when Ingram informed Fafara that she was pregnant, he responded by saying, "I need more boys on my team, transition your process and transition your team."  (Id. ¶ 48.)  Ingram alleges that she received unwarranted negative evaluations because of her pregnancy and also had an extra fifteen-hour-a-week commitment added to her workload.  (Id. ¶ 49.)  She alleges that Fafara treated men more favorably than he treated women, and that he applied inconsistent performance standards for men and women.  (Id. ¶¶ 49-54.)  When Ingram informed Fafara's supervisor, Bob Arata, about Fafara's inconsistent treatment of men and women, he responded by saying, "Well, Donna, we all have our biases."  (Id. ¶ 55.)

In May 2011, Fafara was promoted and Ingram began reporting to Tracy Richards.  (Id. ¶ 58.)  Ingram alleges that Richards was immediately hostile toward her.  (Id. ¶ 60.)  Richards asked Ingram if she "needed a hug" when Ingram told her about Fafara's discrimination.  (Id. ¶ 62.)  At some point, Richards disbanded Ingram's team.  (Id. ¶ 63.)  After the team was

disbanded, Richards transferred the lowest-performing employees to Ingram's new team (id. ¶ 86), and Richards instructed Ingram to "manage out" and terminate African American employees (id. ¶¶ 91-98).

In October 2011, Ingram began reporting to Christopher Hammond.  (Doc. No. 24 ¶ 66.) Ingram alleges that Hammond overrode Ingram's assessments of her team members in order to drive out and terminate the non-Caucasian employees who outperformed their Caucasian colleagues.  (Id.)  When Ingram advocated for a more consistent rating process, Hammond yelled at her in front of her team members, saying, "Well, if you need everything spelled out for you, then maybe this isn't the job for you."  (Id. ¶ 68.)  When Ingram asked Hammond to continue their conversation in private, Hammond responded by saying, "You need to get off the back of the bus."  (Id. ¶ 69.)  Ingram also alleges that Hammond asked her to "manage out" African American employees.  (Id. ¶ 76.)  When she refused to do so, it was reflected in her 2011 evaluation, which stated that she should be "ensuring that the performance management process is driving poor performance out of the organization" and that she should "balance [her] ability to be the voice of the crew with the understanding of the needs of the business."  (Id.)   In addition, Ingram alleges that when she was pregnant in 2010, Hammond told her that "they were going to make her have her baby early."  (Id. ¶ 70.)

Ingram informed Vanguard's senior management and Crew Relations about the discriminatory behavior that she witnessed and was subjected to, but they were unresponsive. (Id. ¶¶ 77-79.)  Ingram claims that, because of her complaints, she was shunned and excluded from meetings and received negative performance evaluations.  (Id. ¶¶ 81-83.)

On April 10, 2012, Ingram dual-filed a Charge of Discrimination against Vanguard with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human

Relations Commission ("PHRC").  (Id. ¶ 87.)  In August 2012, Ingram claims that in retaliation for these complaints Richards modified Ingram's workload and told her to "look for a new role." (Id. ¶ 89.)

In September 2012, Ingram's senior manager, Martin Schamis, asked her if she would be attending a company charity event for United Way.  (Id. ¶ 100.)  Ingram responded that she would be, and Schamis said, "Wait until you see my costume."  (Id.)  Schamis attended the event dressed as a giant monkey, even though the event did not call for costumes.  (Id.)  Ingram believes that this was intended as a racial insult.  (Id. ¶ 102.)  Ingram also claims that Schamis retaliated against her in her 2012 performance evaluation by including numerous inaccuracies and improperly using input from Richards, who was no longer Ingram's manager.  (Id. ¶¶ 104-10.)  Ingram alleges that this was in retaliation for her complaints of discrimination.  (Id.)

On June 6, 2013, Ingram filed an Amended Charge of Discrimination against Vanguard. (Id. ¶ 113.)  She alleges she continued to experience discriminatory and retaliatory treatment after this charge was filed.  (Id. ¶ 114.)  On July 15, 2013, Ingram claims that her manager at the time, Christopher Schmidt, unfairly gave her a written alert.  (Id. ¶ 117.)  In this alert, Schmidt claims that Ingram did not support her peers, despite overwhelming evidence to the contrary. (Id.)  Schmidt also claims that Ingram failed to address performance issues with an African American member of her team.  (Id. ¶¶ 118-19.)  Ingram alleges that Schmidt was consistently disrespectful to her, while he was very respectful to his Caucasian male colleagues.  (Id. ¶ 120.) In addition, Ingram claims that neither Schmidt nor Crew Relations did anything regarding offensive comments about her that a coworker posted on Facebook.  (Id. ¶ 121-125.)

In October 2013, Ingram states that the discrimination and retaliation at Vanguard had become so unbearable that, at the suggestion of her doctor, she went out on leave.  (Id. ¶ 126.)

She also claims that the extreme stress she experienced at Vanguard triggered and exacerbated an underlying medical condition.  (Id.)  Ingram's doctor has advised her that returning to Vanguard would be detrimental to her health.  (Id. ¶ 129.)

### 2.    Plaintiff DiGiovanni's Individual Claims

Jo DiGiovanni began her career at Vanguard in 2004 as a Supervisor in the Bank Services Department.  (Doc. No. 24 ¶ 133.)  In October 2006, Christine Rogers-Raestch became DiGiovanni's manager.  (Id. ¶ 135.)  Rogers-Raestch and DiGiovanni's department head, Laura Marakowski, began to harass DiGiovanni for refusing to "manage out" an older, African American, female associate.  (Id. ¶ 136-38.)  Rogers-Raestch changed DiGiovanni's year-end performance rating from "Distinguished" to "Accomplished" in retaliation for DiGiovanni's refusal to "manage out" this associate.  (Id. ¶ 139.)  DiGiovanni alleges that her unwillingness to "manage out" this associate continued to negatively impact her performance reviews.  (Id. ¶¶ 150, 155-56.)

Rogers-Raestch also discouraged DiGiovanni from applying for managerial positions.  (Id. ¶ 141.)  From mid-2007 through the end of 2008, DiGiovanni alleges that she applied for roughly eight positions, but was never hired—despite being more qualified than the other applicants.  (Id. ¶ 142.)  After DiGiovanni was declined for several positions, Rogers-Raetsch told DiGiovanni that she was not involved with the selection process.  (Id.)  This conversation led DiGiovanni to believe that Rogers-Raetsch had in fact interfered with her ability to obtain these positions.  (Id.)  After DiGiovanni was not selected for any position, she complained to her new manager, Pat Manley, who disregarded her concerns.  (Id. ¶ 148.)

In March 2012, one of DiGiovanni's younger male colleagues, Lester Hawthorne, made an ageist and sexist comment to her while discussing the need for associates to pass the Series 7

examination.[10]  (Id. ¶ 159.)  He told DiGiovanni that, while the examination was challenging, she could pass if she studied.  (Id.)  He said, "Heck, I've even seen older women, like in their 50s, pass the test."  (Id.)

Also in March 2012, DiGiovanni contacted Crew Relations to complain about the hostile environment and discrimination she experienced at Vanguard.  (Id. ¶ 161.)  In April 2012, DiGiovanni applied for three positions in other departments at Vanguard.  (Id. ¶ 162.)  She was turned down for all three positions due to low ratings on her performance evaluations given by Arata, who apparently was her "skip-level" supervisor at the time.  (Id. ¶ 163.)

In May 2012, DiGiovanni again contacted Crew Relations about her continued mistreatment based on her age and gender.  (Id. ¶ 165.)  In July 2012, DiGiovanni received the lowest performance rating of her tenure at Vanguard.  (Id. ¶ 166.)  DiGiovanni alleges that the low rating was not warranted and was simply done in retaliation for her complaints of discrimination.  (Id.)

On October 3, 2012, DiGiovanni dual-filed a Charge of Discrimination against Vanguard with the EEOC and PHRC.  (Id. ¶ 167.)  Shortly after filing the discrimination charge, DiGiovanni met with her manager at the time, Brian Hamilton, who told her she would receive a "really tough message" at the end of the year.  (Id. ¶ 169.)  During the meeting, Hamilton also attacked DiGiovanni's leadership ability and told her that she did not add value to Vanguard and that she should start looking for employment elsewhere.  (Id.)

After meeting with Hamilton, DiGiovanni became distraught and contacted Crew Relations again about the discriminatory and retaliatory treatment she experienced at Vanguard.

---

[10] The Series 7 examination is formally known as the General Securities Representative Examination.  Individuals who pass the Series 7 examination are eligible to register to trade all securities products.

(Id. ¶ 174.)  She explained to a Crew Relations representative that Richards and Hamilton had begun referring to older employees as "low energy" and younger employees as "high energy." (Id. ¶ 175.)  Crew Relations did not remedy the situation.  (Id. ¶¶ 176-77.)

In December 2012, in retaliation for the Charge of Discrimination DiGiovanni filed, she received her first ever "Further Development Needed" rating on her year-end review.  (Id. ¶ 180.) This rating severely impacted her compensation.  She did not receive a merit raise or bonus for the first time in her eight-year career at Vanguard.  (Id.)  In further retaliation for her complaints, DiGiovanni was rated poorly in her 2013 mid-year review.  (Id. ¶ 181.)

DiGiovanni alleges that the environment at Vanguard became so toxic that it worsened her severe stress and depression.  (Id. ¶ 185.)  At the time the Amended Complaint was filed, DiGiovanni was on sick leave and under the treatment of a therapist and a psychiatrist.  She is also on medication for stress and depression.  (Id. ¶ 186.)  She has been advised that returning to Vanguard would be detrimental to her health.  (Id. ¶ 187.)

### 3.    Plaintiff Kenworthy's Individual Claims

Wendy Kenworthy began her career at Vanguard in November 1997.  (Id. ¶ 191.)  She became a Supervisor in the Small Business Services department in 2004.  (Id.)  In 2008, the Small Business Services group became Retail Operations and Kenworthy began reporting to Jeff Fafara.  (Id. ¶ 192.)

Under Fafara, and then later under Christopher Hammond, Kenworthy was asked to "manage out" female employees who were either African American or older.  (Id. ¶ 194.)  Fafara and Hammond told her that her job was on the line if she refused.  (Id.)

While working under Fafara, Kenworthy noticed that he treated women differently than men.  (Id. ¶ 196.)  Fafara would ignore poor performance by men, but would routinely chastise

female employees for their performance.  (Id. ¶ 198)  Fafara also gave female supervisors far heavier workloads than male supervisors.  (Id. ¶ 205.)  Additionally, when Ingram announced in a meeting that she was going out on maternity leave, Fafara said he wished he had more men on his team.  (Id. ¶ 196.)  This made Kenworthy feel that having a child would have a negative impact on her career.  (Id.)

In 2010, frustrated with Fafara's discriminatory treatment of women, Kenworthy, Ingram, and another woman who reported to Fafara met with Crew Relations.  (Id. ¶ 199.)  Crew Relations ignored their complaints.  (Id.)  After Crew Relations failed to take action, the women met with their senior manager, Arata.  (Id. ¶ 199.)  Arata also did nothing.  (Id.)

At the end of 2010, Fafara lowered the ratings of Kenworthy's female team members without first consulting her.  (Id. ¶ 202.)  Before the time that Kenworthy complained about Fafara to Crew Relations and Arata, Kenworthy always had been allowed to provide input on such ratings.  (Id. ¶ 203.)

In early 2011, Kenworthy was asked to take over a Transfer of Assets team.  (Id. ¶ 207.)  She never had performed in this role before.  (Id.)  No other male manager was moved to a role in which they had no previous experience.  (Id.)

In November 2011, Kenworthy began reporting to Christopher Hammond.  (Id. ¶ 208.)  Under Hammond, Kenworthy was given a rating lower than "Fully Successful" for the first time in fourteen years.  (Id. ¶ 209.)  Kenworthy alleges that she was given this rating in retaliation for her complaints about Fafara.  (Id.)  Moreover, Kenworthy alleges that she was given insufficient opportunity to correct any deficiencies in her performance.  (Id. ¶ 210-12.)

During a meeting with Hammond, Kenworthy informed him that she learned in June 2011 that she may have breast cancer.  (Id. ¶ 213.)  Hammond responded by saying, "Oh, that is

what is wrong with you.  That's what happened to you."  (<u>Id.</u>)  Kenworthy believes that Hammond was insinuating that her performance declined because of this potential illness.  (<u>Id.</u>)

Additionally, under Hammond, Kenworthy continued to receive far more work than her male colleagues.  (<u>Id.</u> ¶ 214.)  Kenworthy claims that no matter how hard she worked, she never received recognition.  (<u>Id.</u> ¶ 216.)  For instance, her Caucasian male colleagues would often receive $250 "spot bonuses," while Kenworthy did not receive such bonuses.  (<u>Id.</u>)  Kenworthy also claims that Tracy Richards, a female manager in her department, contributed to the discrimination against her.  (<u>Id.</u> ¶¶ 217-20.)  For instance, Richards would often take projects away from Kenworthy's male colleagues and give them to her without the support needed for the projects to succeed.  (<u>Id.</u>)

In March 2012, Kenworthy began reporting to a new manager, Bob Smith.  (<u>Id.</u> ¶ 222.)  In August 2012, Smith informed Kenworthy that she might be trending toward a rating of "Further Development Needed" because she did not complete her projects "fast enough."  (<u>Id.</u> ¶ 224.)

On September 26, 2012, Kenworthy dual-filed a Charge of Discrimination against Vanguard with the EEOC and PHRC.  (<u>Id.</u> ¶ 225.)  Roughly three months after filing this charge, Kenworthy received her lowest rating as an employee at Vanguard.  (<u>Id.</u> ¶ 227.)  In a February 2013 meeting with Smith, she was given a written warning.  (<u>Id.</u> ¶ 228.)  Kenworthy claims that the timing of this warning was "extremely odd" because such alerts generally are given closer in time to a poor end-of-year rating.  (<u>Id.</u>)

In May 2013, Kenworthy received her mid-year evaluation.  (<u>Id.</u> ¶ 230.)  Despite improving her performance, Smith extended her warning for another sixty days.  (<u>Id.</u>)  Shortly after receiving this warning, Kenworthy began reporting to Chris Schmidt.  (<u>Id.</u> ¶ 231.)

Keworthy informed Schmidt that she had not received a copy of the extended warning.  (Id. ¶ 232.)  Schmidt told her that it was written with the same wording as the initial warning.  (Id.)  Kenworthy claims that, since the warning was not updated, she was unaware of any additional deficiencies in her performance.  (Id. ¶ 233.)

On August 21, 2013, Kenworthy met with Schmidt.  (Id. ¶ 234.)  At this meeting, Schmidt gave her a formal warning.  (Id.)  The warning addressed issues with Kenworthy's performance that were never previously raised.  (Id.)

On October 20, 2013, Kenworthy was called into a meeting with Crew Relations.  (Id. ¶ 235.)  Crew Relations informed her that her employment with Vanguard was being terminated.  (Id.)  Kenworthy was shocked.  No one had communicated with her about any failure to meet the objectives outlined in the August 21, 2013 warning.  (Id.)

Kenworthy alleges that, as a result of the hostile and discriminatory environment at Vanguard, she has "suffered mental, physical and emotional distress, including, but not limited to, sleeplessness, nervousness, headaches, and depression, as well as humiliation, ridicule, a loss of self-respect and confidence, physical injury and damage, all of which have negatively affected her and have caused a great damage to her career and professional standing."  (Id. ¶ 239.)

## III.   STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  After Iqbal it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 663; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ethypharm S.A. France v. Abbott Labs., 707 F.3d 223, 231 n.14 (3d Cir. 2013) (citing Sheridan v. NGK Metals

Corp., 609 F.3d 239, 262 n.27 (3d Cir. 2010)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Twp., 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679).  "This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged."  Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679.  The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.

**IV.    ANALYSIS**

As noted above, Defendants seek to dismiss (1) Plaintiffs' claims asserted in paragraphs 48-58, 75, 134-53, and 192-208 of the Amended Complaint because they are time barred; (2) Plaintiffs' hostile work environment claims; and (3) Plaintiffs' disparate impact claims. For reasons that follow, the Court will dismiss as time barred paragraphs 142-45 and 147-48 of the Amended Complaint, which allege that Vanguard discriminated or retaliated against Plaintiff DiGiovanni when she failed to obtain certain positions she applied to from 2007 to 2009. Plaintiffs' disparate impact claims will also be dismissed. Plaintiffs' hostile work environment claims will not be dismissed.

**A.    Defendants' Motion to Dismiss Certain Allegations as Time Barred Will Be Granted in Part and Denied in Part**

Defendants move to dismiss the allegations set forth in paragraphs 46-58, 75, 134-53, and 192-208 of the Amended Complaint, arguing that they are time barred because they concern events that occurred more than 300 days before Plaintiffs filed their administrative charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"). (Doc. No. 26-2 at 12-18.) In their Brief in Opposition to Defendants' Motion to Dismiss, Plaintiffs argue that even if these allegations do not by themselves support claims because they are time barred, they can still be considered as (1) relevant background evidence in support of Plaintiffs' timely discrimination claims, and (2) support for Plaintiffs' hostile work environment claims. (Doc. No. 28 at 14-18.) For reasons that follow, Defendants' Motion to Dismiss these allegations will be granted in part and denied in part.

Before bringing a lawsuit under Title VII, the ADEA, or the PHRA, plaintiffs must first exhaust their administrative remedies. To bring claims under Title VII or the ADEA, plaintiffs

must file a charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice.  42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(1).  To bring claims under the PHRA, plaintiffs must file a charge of discrimination with the PHRC within 180 days of the alleged unlawful employment practice.  43 Pa. Stat. Ann. § 959(h).

In the Motion to Dismiss, Defendants argue that the allegations set forth in paragraphs 46-58, 75, 134-53, and 192-208 only concern Plaintiffs' claims under Title VII, the ADEA, and the PHRA, and relate to acts that occurred over 300 days before Plaintiffs dual-filed their administrative charges with the PHRC and EEOC.[11]  (Doc. No. 26-2 at 12.)  Since the 300-day statute of limitations under Title VII and the ADEA is the longest statute of limitations relevant to these allegations, Defendants contend that these allegations should be dismissed as time barred.[12]

---

[11] Defendants argue that none of the allegations set forth in paragraphs 46-58, 75, 134-53, and 192-208 of the Amended Complaint relate to Plaintiff Ingram's Section 1981 claims.  (Doc. No. 26-2 at 14.)  Section 1981 only protects against race discrimination and does not require exhaustion of administrative remedies.  See Johnson v. Ry. Exp. Agency, Inc., 421 U.S. 454, 460 (1975) (noting that "the filing of a Title VII charge and resort to Title VII's administrative machinery are not prerequisites to the institution of a Section 1981 action"); Anjelino v. N.Y. Times Co., 200 F.3d 73, 98 (3d Cir. 1999) ("[Section 1981], on its face, is limited to issues of racial discrimination in the making and enforcing of contracts.").  Defendants argue that Section 1981 cannot save Ingram's untimely allegations because her allegations in the challenged paragraphs are based on gender, not race, discrimination.  (Doc. No. 26-2 at 14.)  The Court does not have to decide this question because, as explained below, none of Ingram's allegations will be dismissed as untimely at this stage of the proceeding.

[12] Plaintiff Ingram filed her administrative complaint with the EEOC and the PHRC on April 10, 2012.  (Doc. No. 24 ¶ 2, Ex. A.)  Therefore, her Title VII claims are limited to acts that occurred on or after June 15, 2011, and her PHRA claims are limited to acts that occurred on or after October 13, 2011.  Plaintiff DiGiovanni filed her administrative complaint with the EEOC and PHRC on October 3, 2012.  (Id. ¶ 167, Ex. C.)  Her Title VII and ADEA claims therefore are limited to acts that occurred on or after December 8, 2011, and her PHRA claims are limited to acts that occurred on or after April 6, 2012.  Plaintiff Kenworthy filed her administrative complaint with the EEOC and PHRC on September 26, 2012.  (Id. ¶ 225, Ex. D.)  Her Title VII claims therefore are limited to acts that occurred on or after December 1, 2011, and her PHRA claims are limited to acts that occurred on or after March 30, 2012.

In support of their argument, Defendants rely on the U.S. Supreme Court's decision in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), and decisions by courts in the Third Circuit interpreting Morgan.  In Morgan, the Court addressed the question of whether an act that falls outside the statute of limitations for filing an administrative charge can support a lawsuit under Title VII.[13]  536 U.S. at 108.  The Court held that the answer differs depending on whether the plaintiff is seeking to recover for a discrete discriminatory act or a hostile work environment.  Id. at 110.

The Court stated that a discrete discriminatory act is a separately actionable unlawful employment practice.  Id. at 114.  A plaintiff seeking to recover for a discrete discriminatory act must file an administrative charge within the statute of limitations, or else that discrete discriminatory act cannot support a lawsuit.  Id. at 113.  However, a plaintiff may use acts that occurred outside the statute of limitations period as background evidence in support of a timely claim.  Id.  The Court explained as follows:

> [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act.  The charge, therefore, must be filed within the [relevant statute of limitations time period] after the discrete discriminatory act occurred.  The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.  Nor

---

[13] Although the U.S. Supreme Court in Morgan only addressed Title VII, its analysis regarding the statute of limitations for filing an administrative charge is also applicable to the PHRA and the ADEA.  Courts generally apply the same analysis to claims under parallel provisions of Title VII, the ADEA, and the PHRA.  See Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1084 (3d Cir. 1995) (noting that the PHRA "is construed consistently with interpretations of Title VII"); Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 330 (3d Cir. 1995) ("Because the prohibition against age discrimination contained in the ADEA is similar in text, tone, and purpose to that contained in Title VII, courts routinely look to law developed under Title VII to guide an inquiry under ADEA.").

does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

Id.  See also McCann v. Astrue, 293 F. App'x 848, 850 & n.3 (3d Cir. 2008) ("The law makes clear that discrete discriminatory acts that are actionable on their own may not be aggregated under a continuing violation theory. . . .  They may, however, be used as background evidence in support of timely claims.").

"Hostile work environment claims," the Court reasoned, "are different in kind from discrete acts." Morgan, 536 U.S. at 115.  A hostile work environment claim exists "'[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Id. at 116 (quoting Harris v. Forklift Sys., 510 U.S. 17, 21 (1993)).  A hostile work environment "cannot be said to occur on any particular day."  Id.  Rather, "[i]t occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."  Id.  Thus, a "hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"  Id. at 117.

With regard to whether an act that falls outside the statute of limitations period can be part of a hostile work environment claim, the Court stated the following:

> Given, therefore, that incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim.  In order for the charge to be timely, the employee need only file a charge within [the statute of limitations period] of any act that is part of the hostile work environment.

Id. at 118.  According to the Court in Morgan, a hostile work environment is a continuing violation such that an act that occurred before the statute of limitations period may be considered

part of a claim.  Id. at 117-18.  It is only necessary that at least one act contributing to the claim

falls within the statute of limitations period.  Id.

In O'Connor v. City of Newark, the Court of Appeals for the Third Circuit interpreted the

holding in Morgan to mean that plaintiffs cannot use a continuing violation theory to aggregate

discrete discriminatory acts that fall outside the statute of limitations period into a hostile work

environment claim.  440 F.3d 125, 127 (3d Cir. 2006).  The court held that the continuing

violation theory is only applicable to acts that are not individually actionable but can be

combined to support a hostile work environment claim:

> Morgan established a bright-line distinction between discrete acts, which are
> individually actionable, and acts which are not individually actionable but may be
> aggregated to make out a hostile work environment claim.  The former must be
> raised within the applicable limitations period or they will not support a lawsuit.
> The latter can occur at any time so long as they are linked in a pattern of actions
> which continues into the applicable limitations period.

Id. (citations omitted).

Therefore, a discrete discriminatory act that occurred outside the statute of limitations

period cannot support a lawsuit, either individually or as part of a hostile work environment

claim.[14]  Id.; see also McCann, 293 F. App'x at 850 & n.3.  Based on Morgan, the Third Circuit

in O'Connor developed "the following non-exhaustive list of discrete acts for which the

limitations period runs from the act:  termination, failure to promote, denial of transfer, refusal to

hire, wrongful suspension, wrongful discipline, denial of training, wrongful accusation."  440

F.3d at 127.

In the present case, Defendants contend that, based on the precedent discussed above, any

discrete discriminatory act that occurred more than 300 days before Plaintiffs filed their

---

[14]  As noted, discrete discriminatory acts that cannot support a lawsuit because they are time
barred still can be used as background evidence to support a timely claim.  See Morgan, 536
U.S. at 113; McCann, 293 F. App'x at 850 & n.3.

administrative charges cannot support a claim under Title VII, the ADEA, or the PHRA.  This is because, as noted above, under Title VII and the ADEA Plaintiffs had 300 days from the date the discrete discriminatory act occurred to file an administrative charge.  Under the PHRA, Plaintiffs had 180 days from the date of the discrete discriminatory act to file an administrative charge.

Defendants argue that the allegations in paragraphs 46-58, 75, 134-53, and 192-208 of the Amended Complaint involve discrete acts that occurred over 300 days before Plaintiffs filed their administrative charges.  As such, they argue that these allegations should be dismissed as time barred.  The Court does not agree that all the allegations in these paragraphs are time barred.  Accordingly, Defendants' Motion to Dismiss these allegations will be granted in part and denied in part.

### 1. Ingram's allegations in paragraphs 46-58 and 75 of the Amended Complaint will not be dismissed

As noted, Plaintiff Ingram dual-filed her administrative charge with the EEOC and PHRC on April 10, 2012.  (Doc. No. 24, Ex. A.)  Therefore, her Title VII claims are limited to acts that occurred on or after June 15, 2011.  Defendants seek to dismiss Ingram's allegations in paragraphs 46-58 and 75 of the Amended Complaint, arguing that they relate to discrete acts that occurred before June 15, 2011.   These allegations read as follows:

46. In 2008, Ingram transferred to the Retail Processing Group as a Supervisor and began reporting to Jeff Fafara, Manager in the Retail Processing Group at Vanguard.

47. Almost immediately Fafara instructed Ingram to manage out two older African American women, which Ingram refused to do without merit.

48. In 2010, after Ingram informed Fafara that she was pregnant and would need to take a leave approximately nine months later, Fafara responded by saying, "I need more boys on my team. Transition your process and transition your team."

49. During that year, Ingram was negatively evaluated on projects, which she no longer owned because she had been forced to transition them solely because she was pregnant. Such negative evaluations impacted both her professional standing

22

within Vanguard's organization and her compensation. Moreover, Fafara added an extra fifteen hour a week commitment to Ingram's workload without first consulting her. This commitment was not imposed upon any of Ingram's white, male colleagues.

50. Under Fafara, Ingram witnessed firsthand how he regularly applied inconsistent performance standards for men and women and for Caucasians and non-Caucasians.

51. For example, Fafara would overturn performance ratings that Ingram and her fellow female supervisors, Kenworthy and Corie McDevitt ("McDevitt") had objectively determined based on performance.

52. Fafara would then instruct Ingram, Kenworthy and McDevitt to award ratings so that male Processing Associates would receive higher ratings than female Processing Associates irrespective of performance.

53. Fafara interacted very differently with men and women. While he was frequently sterile and cold to his female subordinates and socially shunned them, he was cordial and inviting to his male subordinates.

54. Ingram, Kenworthy and McDevitt informed Fafara's supervisor, Defendant Bob Arata, of the preferential treatment that Fafara was displaying towards men and his discriminatory treatment of pregnant women and women generally.

55. Arata responded to Ingram by saying, "Well, Donna, we all have our biases." Upon information and belief, Arata took no steps to remedy the hostile and discriminatory environment that Fafara created for Ingram, Kenworthy and other women.

56. Upon returning from maternity leave in January 2011 and through Fafara's promotion in May 2011, Ingram continued to suffer the discriminatory conduct of Fafara and retaliation for her complaints about his discriminatory behavior.

57. Shortly after returning from maternity leave, Fafara assigned three additional projects to Ingram knowing that she did not have adequate assistance to handle these projects.

58. Fafara's discriminatory and retaliatory conduct continued until he was promoted in approximately May 2011. His decision not to elevate Ingram to a process owner impacted Ingram's compensation into 2012 and beyond.

* * *

75. When Ingram first joined the Retail Operations group, Fafara advocated for two of Ingram's African American employees to be "managed out" of the organization.

(Doc. No. 24 ¶¶ 46-58, 75.)

None of Ingram's allegations in these paragraphs relate to a termination, failure to promote, denial of transfer, refusal to hire, or wrongful suspension—which are the discrete discriminatory acts identified by the Third Circuit in O'Connor. Therefore, at this stage of the proceeding, the Court will not dismiss these allegations as time-barred discrete acts.

### 2. DiGiovanni's allegations in paragraphs 134-53 of the Amended Complaint will be dismissed in part

Plaintiff DiGiovanni filed her administrative complaint with the EEOC and PHRC on October 3, 2012. (Doc. No. 24, Ex. C.) Her Title VII and ADEA[15] claims therefore are limited to acts that occurred on or after December 8, 2011. Her allegations that Defendants seek to dismiss as time-barred discrete acts are in paragraphs 134-53. These paragraphs read as follows:

134. Roughly eighteen months after joining Vanguard, in August 2006, DiGiovanni's then-manager Bill Greco ("Greco") approached her about taking over two merged teams in the Bank Services group. The role Greco wanted DiGiovanni to take over was the most critical role in the department at the time. Although DiGiovanni was considering a position in another area, she agreed to take the role after significant coaxing by Greco. Greco told DiGiovanni that she was chosen for this assignment because she was the strongest supervisor in the Bank Services department. Greco told DiGiovanni that she was on track to receive a "Distinguished" rating and that, if she continued to do a good job in her then-current role and take on the new role, he would rate her "Distinguished" at year's end.

135. In October 2006, Greco went out on sick leave and Christine Rogers-Raestch ("Rogers-Raestch") became DiGiovanni's manager.

136. In October 2006, Rogers-Raestch and DiGiovanni's department head, Laura Marakowski ("Marakowski"), began to harass DiGiovanni for supporting one of her older, African American female associates. Rogers-Raestch wanted

---

[15] Plaintiff DiGiovanni is the only Plaintiff who asserts an age discrimination claim under the ADEA.

DiGiovanni to "manage out" the associate based on her alleged performance deficiencies.

137. As the immediate supervisor, DiGiovanni did not think her performance warranted termination. Instead, DiGiovanni worked with the associate to strengthen her performance.  By the end of the year, the associate had earned an "Accomplished" rating.

138. Rather than laud the marked improvement that was made possible by setting the associate up for success, Rogers-Raestch and Marakowski chastised DiGiovanni's decision to assign the associate the "Accomplished" rating, with Marakowski at one point asking, "If someone was holding a gun to your head, would you say she is 'Accomplished'?", [sic] in a very threatening demeanor.

139. At the end of the year, Rogers-Raestch changed DiGiovanni's end of the year rating from "Distinguished" to "Accomplished" in retaliation for her refusal to "manage out" the older, African American female associate on her team.

140. Soon after receiving her end of the year rating, DiGiovanni began to experience severe signs of stress, including dizzy spells and palpitations. Eventually, DiGiovanni was hospitalized for severe stress induced vertigo. As a result, she was out of work and incapacitated for one month.

141. In 2007, DiGiovanni approached Rogers-Raestch about posting for other positions. Rogers-Raestch strongly discouraged DiGiovanni from positing for several positions of interest. In fact, when DiGiovanni shared with Rogers-Raestch her interest in a managerial position, Rogers-Raestch laughed loudly and stated that just because other supervisors were ready to become a manager, didn't mean that DiGiovanni was ready. The supervisors Rogers-Raestch was referring to were both young, Caucasian males that had been promoted as soon as their time-in-job requirement of 18 months was met.

142. In 2007, DiGiovanni began to apply for lateral positions in different areas. From mid-2007 through the end of 2008, DiGiovanni applied for roughly eight positions, but was never hired for any of the positions despite being more qualified than the people who were ultimately selected.  Rogers-Raestch made it a point to approach DiGiovanni after she was declined for a few of these positions and explain that Rogers-Raestch had "nothing to do with [DiGiovanni] not getting the job."  Such a comment was odd and led DiGiovanni to believe that Rogers-Raestch, in fact, interfered with her ability to successfully post for another position.

143. The fact that DiGiovanni was never given any of the positions for which she applied was shocking because of her proven performance at Vanguard.  Although DiGiovanni's supervisors trusted the quality of her work enough to constantly assign the most challenging tasks to her, DiGiovanni was not deemed deserving of

an opportunity to advance at Vanguard. At interviews, DiGiovanni received no negative feedback or opportunity areas.  Instead, DiGiovanni was told that she was "just beat out" for the positions for which she applied.

144. By way of example, in April 2008, DiGiovanni applied for an Accounts Payable Position. DiGiovanni interviewed with the Principal and was confident she would be hired based on her experience and qualifications for that position. At Vanguard, an interview with the Principal generally signals that the interviewee is the finalist. That position, however, was given to a less qualified Vanguard employee who was younger and had far less experience that DiGiovanni did.

145. After learning that the Accounts Payable position went to a less qualified younger employee, DiGiovanni investigated which applicants were hired for all of the previous positions for which she applied.  All of those positions were given to less qualified, younger employees with less experience, demonstrating a pattern and practice of age discrimination.

146. In 2008, DiGiovanni was assigned a new manager, Pat Manley ("Manley").

147. Soon thereafter, in 2009, DiGiovanni applied for another Accounts Payable position for which a recruiter contacted her and suggested she apply. DiGiovanni interviewed with a manager who remembered her from previous interviews. During the interview, they engaged in small talk and the manager all but assured DiGiovanni the position was hers. DiGiovanni was well qualified as indicated by the recruiter who requested that she apply and the interviewer. Once again, however, DiGiovanni did not get that position. The position was given to a less qualified and significantly younger female with no supervisory experience.

148. After being turned down for all of the jobs for which she applied, DiGiovanni complained to Manley that she felt she was being discriminated against on the basis of age.  Consistent with the Vanguard culture of ignoring and dismissing complaints of unlawful discrimination, Manley disregarded her concerns.

149. In 2009, DiGiovanni was asked to spearhead a pilot quality assurance program with a new team.  DiGiovanni was responsible for building the program from the ground up—a task that proved very challenging.  Despite the inherent difficulty in developing this program, DiGiovanni was often lauded by her peers and supervisors with respect to her successful performance.  DiGiovanni's end of the year performance appraisal did not reflect her performance. Instead of receiving the "Distinguished" rating she had earned, DiGiovanni was rated overall "Fully Successful." This rating negatively impacted her bonus, her potential to receive raises and her reputation for purposes of applying for new positions.

150. DiGiovanni spoke to her manager, Alan Copeland ("Copeland"), to ask him why she had not been rated "Distinguished" and asked how she could improve for the upcoming year.  Mr. Copeland told her that although people noticed how well she performed, she should be more outspoken.  Specifically, Copeland informed DiGiovanni that the perception of DiGiovanni amongst the managers was that DiGiovanni was too soft on the crew.  Upon information and belief, that opinion was circulated amongst managers following DiGiovanni's refusal to terminate an older African-American female.

151. Despite the inaccurate perception of DiGiovanni, in 2010, DiGiovanni took proactive steps to be more outspoken and maintained her performance level.

152. Despite following Mr. Copeland's suggestion, in 2010, DiGiovanni received the same rating.  DiGiovanni approached Mr. Copeland again about how to receive a "Distinguished" rating. Mr. Copeland responded that she needed to become a process owner.

153. In 2011, DiGiovanni was asked by her principal John Haines ("Haines") to become a process owner on his team. Haines asked her to join his team because he heard positive feedback on how well DiGiovanni was handling the process owner position in the department.

(Doc. No. 24 ¶¶ 134-53.)

Paragraphs 142-45 and 147-48 contain allegations that DiGiovanni was not hired for various positions that she applied to from 2007 to 2009 on account of her sex, age, or both. These acts took place well before December 8, 2011, which is the earliest date in DiGiovanni's statute of limitations period under Title VII and the ADEA.  Refusal to hire is a discrete discriminatory act identified in O'Connor that cannot be aggregated with timely claims under a continuing violation theory.  Accordingly, these allegations are time barred and cannot be a basis for Defendants' liability under Title VII, the ADEA, or the PHRA.  The allegations in paragraphs 142-45 and 147-48 will therefore be dismissed.  The remaining allegations in paragraphs 134-41, 146, and 149-53 will not be dismissed at this stage of the proceeding.

**3.**   **Kenworthy's allegations in paragraphs 192-208 of the Amended Complaint will not be dismissed**

Plaintiff Kenworthy filed her administrative complaint with the EEOC and PHRC on September 26, 2012.  (Doc. No. 24, Ex. D.)  Her Title VII claims therefore are limited to acts that occurred on or after December 1, 2011.  Her allegations that Defendants seek to dismiss as time barred are in paragraphs 192-208 of the Amended Complaint.  These allegations read as follows:

192.  In 2008, the Small Business Services group merged to become Retail Operations and Kenworthy began reporting to Jeff Fafara, Manager.

193.  Ingram also reported to Fafara during this time period.

194.  As was the case with Ingram, Kenworthy was also often sought to "manage out" the female, African American or older employees under Fafara and Defendant Christopher Hammond.  If Kenworthy refused to put someone on performance management or fire them, she was told by Fafara and Hammond that her job would be on the line and that she was "too soft" on her crew.

195.  In 2010, Ingram, McDevitt and Kenworthy were the only three female supervisors reporting to Fafara.  There was a noticeable difference in the way Fafara treated the three of them as compared to the male supervisors he managed; the latter were treated more favorably.

196.  In a staff meeting, after McDevitt returned from maternity leave and Ingram announced that she would be leaving for maternity leave in a few months, Fafara inappropriately commented that he wished he had more males on his team.  Fafara's comment made Kenworthy feel that, as a woman, if she chose to have a child, that decision would be detrimental to her career and she would be treated differently and lose the respect of her manager.

197.  In contrast, male employees were not demeaned or treated in such a hostile manner if they chose to become parents.

198.  While working under Fafara, Kenworthy witnessed him treat her male and female crew members differently.  Specifically, on Kenworthy's team, there were two lower performing crew members—one male, one female.  While the male crew member's poor performance and productivity issues were ignored by Fafara, he would routinely chastise the female crew member for her performance, despite knowing that her performance was affected by her well-known health issues.

199.  Frustrated with the discriminatory treatment of women in their department, McDevitt, Ingram and Kenworthy met with Crew Relations in 2010 to discuss their issues with Fafara.  In this meeting, they reported the inappropriate comment

28

Fafara made in the staff meeting.  Despite the overwhelming evidence of discrimination and the corroboration of the incidents that had occurred, Crew Relations did not take any proactive steps to address Ingram, McDevitt and Kenworthy's concerns or remedy the discrimination against women in the Retail Services Department.  Instead, Crew Relations ignored their complaints.

200. After meeting with Crew Relations, McDevitt, Ingram and Kenworthy met with their senior manager, Defendant Bob Arata and discussed the differential treatment of women and men by Fafara.  Like Crew Relations, Arata dismissed their concerns.

201. Upon information and belief, neither Crew Relations nor Arata conducted an investigation into the concerns McDevitt, Ingram and Kenworthy raised in their meetings.

202. At the end of 2010, Fafara lowered Kenworthy's female crew members' performance rating without first consulting Kenworthy.

203. Prior to the complaints of McDevitt, Ingram and Kenworthy, Kenworthy was allowed to give input into such decisions.  Furthermore, Fafara did not exclude any of her male peers in decisions regarding their crew members' performance.

204. Fafara's actions made Kenworthy feel that because she was a woman and had complained of disparate treatment, she was powerless within Vanguard's pervasive discriminatory and retaliatory culture and not trusted to make the right decisions with respect to her crew.

205. Under Fafara, the female supervisors were given a far heavier workload than the male supervisors.  Fafara would often alleviate Kenworthy's male colleagues' workloads by giving their projects to Kenworthy.  Fafara did so without concern for Kenworthy's increased workload.

206. Despite Fafara's discriminatory and retaliatory actions and Vanguard's knowledge of his conduct, he was promoted in mid-2011.

207. In early-2011, Kenworthy was asked to take over a Transfer of Assets ("TOA") team, a function she had never previously performed or managed.  No other white or male manager was moved to a role in which they had no previous experience.

208. In November 2011, Kenworthy began reporting to Defendant Christopher Hammond.  Ingram also reported to Hammond during approximately the same time frame.  Hammond was very good friends with Kenworthy's previous manager, Fafara.

As with Ingram's allegations above, none of Kenworthy's allegations in these paragraphs are the kind of discrete discriminatory acts identified in O'Connor.  Accordingly, they will not be dismissed as time barred at this stage of the proceeding.

**B.**      **Plaintiffs Allege Plausible Hostile Work Environment Claims**

In Andrews v. City of Philadelphia, the Third Circuit Court of Appeals held that a plaintiff must show the following to prevail on a hostile work environment claim:  (1) the plaintiff suffered intentional discrimination because of a protected characteristic; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same characteristics in like circumstances; and (5) a basis for employer liability exists.[16]  Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990).

In the present case, Defendants argue that Plaintiffs cannot state hostile work environment claims because they have not plausibly shown that the alleged harassment was severe or pervasive, as required by the second prong of the Andrews test.  (Doc. No. 26-2 at 23-27.)  Plaintiffs counter that they have alleged enough facts to survive a motion to dismiss.  (Doc. No. 28 at 19-27.)  They contend that the question of whether the conduct was sufficiently severe or pervasive should be reserved for summary judgment or trial.  (Id.)

For reasons that follow, the Court finds that each Plaintiff has plausibly alleged that she faced discriminatory conduct that was sufficiently severe or pervasive to state a hostile work

---

[16] Ingram claims that she suffered a hostile work environment based on race and gender discrimination in violation of Title VII, Section 1981, and the PHRA.  (Doc. No. 24 ¶¶ 244, 256, 270, 279, 293.)  DiGiovanni's hostile work environment claim is based on allegations of gender discrimination in violation of Title VII and the PHRA.  (Id. ¶¶ 270, 293.)  Kenworthy alleges that she was subjected to a hostile work environment based on gender discrimination in violation of Title VII and the PHRA.  (Id. ¶¶ 270, 293.)  The analysis of whether a plaintiff has stated a hostile work environment claim is the same under Title VII, Section 1981, and the PHRA.  See Sherrod v. Phila. Gas Works, 57 F. App'x 68, 75 (3d Cir. 2003).

environment claim.  Accordingly, Defendant's Motion to Dismiss Plaintiffs' hostile work environment claims will be denied.

### 1. The standards for determining whether alleged conduct is sufficiently "severe or pervasive" to state a hostile environment claim

To satisfy the second prong of the Andrews test, each Plaintiff must show that the alleged harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).  To determine whether each Plaintiff has done so, the Court must consider a variety of factors, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., 510 U.S. 17, 23 (1993).  Any other relevant factors, like the employee's psychological well-being, may be taken into account, and no single factor is required. Id.  The Court's analysis "must concentrate not on individual incidents, but on the overall scenario." Abramson v. William Patterson Coll. of New Jersey, 260 F.3d 265, 276 (3d Cir. 2001) (quoting Andrews, 895 F.2d at 1484).  Because the conduct must be severe or pervasive enough to alter the conditions of employment, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotations omitted).

Determining whether harassing conduct is sufficiently severe or pervasive is a highly fact-intensive inquiry, and "does not lend itself to a 'mathematically precise test.'" Long v. Pizza Hut (Store # 635008), No 03-0738, 2003 WL 23019186, at *4 (W.D. Pa. Nov. 5, 2003) (quoting Harris, 510 U.S. at 23).  Therefore, courts have "shown a reluctance to dismiss a complaint at the [motion to dismiss] stage when the primary challenge to the hostile work environment claim is

31

whether or not the conduct in question is severe and/or pervasive." Grasty v. World Flavors, Inc., Civ. No. 11-1778, 2011 WL 3515864, at *9 n.2 (E.D. Pa. Aug. 11, 2011). Because the inquiry is fact-intensive, "summary judgment provides a more appropriate vehicle to resolve [this issue], as the parties at that stage have had an opportunity to conduct discovery and develop their claims." Long, 2003 WL 23019186, at *4.

> **2.      Plaintiffs have plausibly alleged that they were subjected to "severe or pervasive" harassment**

As noted above, Defendants argue that Plaintiffs have failed to allege that the conduct they faced was sufficiently severe or pervasive to state hostile work environment claims. In support of their argument, Defendants primarily rely upon two cases from the United States District Court for the District of New Jersey in which defendants' motions to dismiss hostile work environment claims were granted because the alleged conduct was not sufficiently severe or pervasive.[17] (See Doc. No. 26-2 at 25-26.) These cases are distinguishable from the present case, and therefore do not persuade the Court that Plaintiffs' hostile work environment claims should be dismissed at this stage of the litigation.

In Wise v. Estes, five plaintiffs sued their employer alleging, among other claims, that they were subjected to a hostile work environment on account of their race in violation of

---

[17] In a footnote to its Memorandum in Support of the Motion to Dismiss Partially the Amended Complaint (Doc. No. 26-2 at 25 n.9), Defendants list additional cases in which plaintiffs' hostile work environment claims were dismissed because the alleged conduct was not sufficiently severe or pervasive. See Wadhwa v. Sec'y, Dep't of Vet. Affs., 505 F. App'x 209, 213-14 (3d Cir. 2012); Davis v. City of Newark, 285 F. App'x 899, 901-03 (3d Cir. 2008); Pittman v. Bob, No. 11-0842, 2012 WL 3580157, at *7 (W.D. Pa. Aug. 17, 2012); King v. City of Phila., 66 F. App'x 300, 305 (3d Cir. 2003); Matteo v. Bumble Bee Foods, LLC, No. 14-435, 2014 4094281, at *1, *4-5 (D.N.J. Aug. 18, 2014); Bell v. Waste Mgmt., Inc., No. 03-992, 2004 WL 2451416, at *6 (D. Del. Oct. 29, 2004); Burgess-Walls v. Brown, No. 11-275, 2011 WL 3702458, at *9 (E.D. Pa. Aug. 22, 2011); Nerosa v. Storecast Merch. Corp., No. 02-440, 2002 WL 1998181, at *4 (E.D. Pa. Aug. 28, 2002). The Court has reviewed each of these cases and is satisfied that they are factually distinguishable and that Plaintiffs in the present case have plausibly alleged that the discriminatory conduct was sufficiently severe or pervasive to state a hostile work environment claim.

Section 1981.  Civ. No. 10-481, 2010 WL 2757273, *5-6 (D.N.J. July 6, 2010).  In dismissing plaintiffs' claims, the court explained that plaintiffs "provide no details of the frequency and duration of the alleged harassing conduct."  Id. at *6.  Moreover, the court noted, only one plaintiff made allegations of specific comments directed at him personally.  Most plaintiffs made "only general allegations of belittling conduct."  Id.  Accordingly, the court dismissed plaintiffs' hostile work environment claims without prejudice and gave them leave to amend their complaint to correct the deficiencies.  Id. at 7.

Likewise, in Feeney v. Jefferies, the court dismissed plaintiff's hostile work environment claim because it consisted only of "vague allegations" that gave "no information as to the frequency" of the alleged discriminatory conduct.   Civ. No. 09-2708, 2010 WL 2629065, at *5 (D.N.J. June 28, 2010).  In his complaint, plaintiff claimed that his supervisor "repeatedly" made derogatory comments, but only recounted two occasions on which such comments were made. Id.  In dismissing plaintiff's hostile work environment claim, the court refused to grant him leave to amend the complaint because he had already amended it three times.  Id. at *7.  The court found that "allowing further amendments would unduly protract [the] proceedings."  Id.

In the present case, Plaintiffs' allegations are substantial enough to state a plausible hostile work environment claim.  Unlike the plaintiffs in Wise and Feeney, each Plaintiff in this case provides myriad examples of conduct that they allege created a hostile work environment at Vanguard.  Moreover, each Plaintiff alleges that the hostile work environment at Vanguard damaged her psychological well-being.  (Doc. No. 24 ¶¶ 126-29, 186-87, 239.)

Plaintiff Ingram's allegations include, for instance, Fafara's comment of "I need more boys on my team" when she told him she was pregnant (id. ¶ 48); Hammond's racially charged statement to her that she needed to "get off the back of the bus" (id. ¶ 69); and Schamis's

monkey costume at the United Way Challenge, which she believes was intended as a racial insult (id. ¶¶ 101-02).  Ingram also claims that she was pressured to "manage out" employees who were either female, African American, or older, and that she received a negative performance review because she refused to do so.  (Id. ¶¶ 72-76.)  Ingram states that the hostile work environment at Vanguard became so unbearable that, at the suggestion of her doctor, she "went out on leave in October 2013 for extreme stress, which also triggered and exacerbated an underlying medical condition."  (Id. ¶ 126.)

Plaintiff DiGiovanni's allegations include harassing conduct from her supervisor, Rogers-Raestch, for refusing to "manage out" employees who were either female, African American, or older.  (Id. ¶¶ 135-38.)  DiGiovanni claims that Rogers-Raestch lowered her performance review and interfered with her ability to transfer to other positions within Vanguard because she refused to "manage out" these employees.  (Id. ¶¶ 134, 139, 141-42, 150.)  DiGiovanni also alleges that when she was speaking with a younger male manager, Lester Hawthorne, about the need to obtain a Series 7 license, Hawthorne said "Heck, I've seen older women, like in their 50s, pass the test."  (Id. ¶ 159.)  She states that the environment at Vanguard became "so toxic that it worsened her severe stress and depression."  (Id. ¶ 185.)  At the time the Amended Complaint was filed, she was on sick leave from Vanguard and under the treatment of both a therapist and a psychiatrist.  (Id. ¶ 186.)

Plaintiff Kenworthy, like Ingram and DiGiovanni, alleges that she was instructed to "manage out" employees who were either older, female, or African American.  (Id. ¶ 194.)  She also states that Fafara's comment to Ingram that he needed "more boys on his team" made her feel that her career would be negatively affected if she chose to have a child.  (Id. ¶ 196.)  Kenworthy claims that her complaints about discriminatory treatment were not only ignored, but

made her a target to be "managed out." (Id. ¶¶ 199-201, 223.)  In February 2013, she began to receive unwarranted formal performance warnings from her managers, which culminated in her termination from employment on October 20, 2013.  (Id. ¶¶ 228-35.)  Because of the hostile environment at Vanguard, Kenworthy alleges that she "suffered mental, physical and emotional distress, including, but not limited to, sleeplessness, nervousness, headaches, and depression, as well as humiliation, ridicule, loss of self-respect and confidence, physical injury and damage, all of which have negatively affected her and have caused great damage to her career and professional standing." (Id. ¶ 239.)

Considering the totality of the claims, each Plaintiff has plausibly alleged that she faced discriminatory conduct that was sufficiently severe or pervasive to constitute a hostile work environment.  Their allegations are sufficient to survive Defendants' Motion to Dismiss. Accordingly, Defendants' Motion to Dismiss Plaintiffs' hostile work environment claims will be denied.

### C.     Plaintiffs' Disparate Impact Claims Will Be Dismissed

Defendants seek to dismiss Plaintiffs' disparate impact claims.[18]  (Doc. No. 26-2 at 28.) They argue that Plaintiffs have failed to administratively exhaust these claims because the Charges of Discrimination that they dual-filed with the EEOC and PHRC "do not reference or describe disparate impact claims, nor do they identify any neutral employment practices that can form the basis for a disparate impact claim." (Id.)  Plaintiffs counter that their Charges should be

---

[18] As Defendants note in their Memorandum in Support of their Motion to Dismiss Partially the Amended Complaint, the Amended Complaint has several references to "impact" (see Doc. No. 24 ¶¶ 14, 21, 31-32, 79), but it appears that only Ingram asserts a disparate impact claim in Counts I and III.  (Id. ¶¶ 244, 256.)  For reasons discussed below, none of the Plaintiffs' administrative charges present disparate impact allegations.  Therefore, even assuming all Plaintiffs have asserted disparate impact claims in the Amended Complaint, the claims would be dismissed for failure to exhaust administrative remedies.

"read liberally." (Doc. No. 28 at 27-28.)  Plaintiffs, however, do not address the argument that their Charges fail to identify any neutral employment practice that can support a disparate impact claim.  (See id.)  For reasons that follow, Plaintiffs' disparate impact claims will be dismissed.

"Disparate impact discrimination is a brand of 'unintentional discrimination,' whereby an employer adopts certain practices that are 'facially neutral in their treatment of different groups' but 'in fact fall more harshly on one group than another and cannot be justified by business necessity.'" Byrd v. City of Phila., Civ. No. 12-4520, 2013 WL 5728669, at *3 (E.D. Pa. Oct. 22, 2013) (quoting Raytheon Co. v. Hernandez, 540 U.S. 44, 52 (2003)).  "In the case of disparate impact discrimination, employers act without a deliberately discriminatory motive, but their actions are functionally equivalent to intentional discrimination." Id. (citing Watson v. Ft. Worth Bank & Trust, 487 U.S. 977, 987 (1988)).

For a plaintiff to fulfill her administrative exhaustion requirement with regard to a disparate impact claim, her charge of discrimination "must identify or describe the neutral employment practice which is alleged to disproportionately affect protected employees in order to exhaust disparate impact claims." Brown v. Ameriprise Fin. Servs., Inc., 707 F. Supp. 2d 971, 976 (D. Minn. 2010).  "Otherwise, every assertion of intentional discrimination could be read to imply unintentional discrimination, and all claims of disparate treatment would exhaust claims of disparate impact." Id. at 976-77.

In this case, Plaintiffs' Charges of Discrimination do not identify any neutral employment practice that they allege had a disparate impact on them.  The only employment practices that Plaintiffs identify in their Charges are Vanguard's alleged practice of "managing out" employees who are either female, African American, or older, and Vanguard's allegedly ineffective and retaliatory complaint process.  (See Doc. No. 24 at Ex. A. ¶¶ 22-23, 25, 27-29; Ex. C. ¶¶ 6, 24;

Ex. D. ¶ 4.)  However, these acts are not neutral employment practices that have the unintentional effect of negatively impacting protected classes of employees.  Rather, claims of "managing out" and retaliation are based on theories of intentional discrimination.  See, e.g., Krouse v. Am. Sterilizer Co., 126 F.3d 494, 504 (3d Cir. 1997) (holding that a "retaliatory animus" is required to sustain a retaliation claim); Lafate v. Vanguard Grp., Inc., No. 13-5555, 2014 WL 4384510, at *8 (E.D. Pa. Sept. 5, 2014) (holding that Vanguard's practice of "managing out" minorities "does not appear to be a 'facially-neutral' practice"); Welch v. Eli Lilly & Co., No. 06-0641, 2009 WL 734711, at *2-3 (S.D. Ind. Mar. 18, 2009) (holding that allegations that defendant "coached out" African Americans constituted a disparate treatment claim, not a disparate impact claim).  Therefore, Plaintiffs' Charges of Discrimination fail to identify any facially neutral employment practices that disparately impact a protected class of employees.  Accordingly, Plaintiffs' disparate impact claims will be dismissed because they have failed to exhaust their administrative remedies with respect to them.

## V.    CONCLUSION

For reasons stated above, Defendants' Motion to Dismiss Partially the Amended Complaint (Doc. No. 26) will be granted in part and denied in part.  Defendants' Motion to Dismiss the allegations in certain paragraphs in the Amended Complaint as time barred will be granted only with regard to paragraphs 142-45 and 147-48, which allege that Vanguard discriminated or retaliated against Plaintiff DiGiovanni when she failed to obtain certain positions she applied to from 2007 to 2009.  Defendants' Motion to Dismiss Plaintiffs' hostile work environment claims will be denied.  Defendants' Motion to Dismiss Plaintiffs' disparate impact claims will be granted.  An appropriate Order follows.